# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

_____

Joseph Robert Paul Betts,                           Civ. No. 14-2434 (JJK)

                     Plaintiff,

v.

Carolyn W. Colvin, Acting                           **ORDER**
Commissioner of Social Security

                     Defendant.

_____

Karl E. Osterhout, Esq., Osterhout Disability Law, L.L.C.; and Edward C. Olson, Esq., Disability Attorneys of Minnesota, counsel for Plaintiff.

Pamela Marentette, Esq., Assistant United States Attorney, counsel for Defendant.

_____

JEFFREY J. KEYES, United States Magistrate Judge

        Pursuant to 42 U.S.C. § 405(g), Plaintiff Joseph Betts seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's applications for disability insurance benefits and supplemental security income. This matter is before the Court on the parties' cross-motions for summary judgment. (Doc. Nos. 14, 16.) The parties have consented to the Court's exercise of jurisdiction over all proceedings in this case pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Doc. Nos. 12, 13.) For

1

the reasons stated below, the Court denies Plaintiff's motion for summary judgment and grants Defendant's motion for summary judgment.

## BACKGROUND

### I.   Procedural History

On July 22, 2011, Plaintiff Joseph Betts filed a claim for Child Disability Benefits and Supplemental Security Income with the Social Security Administration, alleging a disability onset date of January 1, 2005. (Tr. 143.) Plaintiff's claims were denied initially on October 3, 2011, and again on reconsideration on November 22, 2011. (Tr. 86, 91.) Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), and received a hearing on January 16, 2013. (Tr. 99, 9.) At the hearing, Plaintiff amended his alleged onset of disability date to July 22, 2011. (Tr. 13–14.) The ALJ issued a decision unfavorable to Plaintiff on February 26, 2013, denying him benefits on both claims. (Tr. 34.) Plaintiff appealed to the Social Security Administration Appeals Council on April 2, 2013. (Tr. 63.) The Appeals Council declined to review the adverse ALJ decision on April 29, 2014. (Tr. 1.) The Appeals Council's denial entered the ALJ's ruling as the final act of the Commissioner of Social Security. *See* 20 C.F.R. § 404.981. Plaintiff now seeks judicial review. 42 U.S.C. § 405(g).

### II.   Factual Background

Plaintiff, born November 16, 1990, was twenty years old on the amended alleged onset of disability, July 22, 2011. (Tr. 13, 53.) Plaintiff has been diagnosed with Generalized Anxiety Disorder, Obsessive Compulsive Disorder,

Attention Deficit Hyperactive Disorder, Schizoaffective Disorder, depression with psychotic features, and learning problems, NOS. (Tr. 290.) In addition to his mental conditions, Plaintiff has sought treatment for stomach pain, back pain, and throat and vocal strain. (Tr. 325; 339; 335–38; 353; 473; 483; 540; 549.) Plaintiff's first treatment for depression was at the age of sixteen, although the records for this treatment are not contained within the administrative record. (Tr. 230, 273.) Prior to the alleged onset of disability, Plaintiff graduated from high school, and completed a year and a half of community college. (Tr. 18–19.) Plaintiff has not held substantial employment either before or after the alleged onset of disability. (Tr. 14–15.) Plaintiff previously moved out of his parent's home to live with friends, but he returned. (Tr. 410.)

Plaintiff completed a function report for the Social Security Administration ("SSA") on September 4, 2011. He described difficulty leaving his home, socializing, driving, sleeping, and reading. (Tr. 176–83.) Plaintiff reported that his daily activities included singing, exercising when he had the energy, meditating every other day to reduce anxiety, and reading. (*Id.*) Plaintiff also stated that he stays in bed for eleven to twelve hours every day. (*Id.*) He noted that he was able to handle his personal care, prepare his own meals on a daily basis, and was able to take care of laundry as well as mowing the grass every week or two. (*Id.*) Plaintiff reported no impairment in his ability to handle his finances or shop, although he did state that driving causes severe anxiety which leads him to almost never drive. (Tr. 25–27; 176–77.)

In his function report, Plaintiff indicated that his ability to focus, interact with others, and remember and follow instructions was impaired by his disability. (Tr. 176–83.) Plaintiff also stated that he was only taking medication for stomach pain at the time of the report. (*Id.*)

## A. Medical Records

Plaintiff has received treatment for physical and mental symptoms in the years preceding and following the alleged onset of his disability. On his function report, submitted in connection with his application for benefits, Plaintiff indicated that his ability to work was impacted by his mental and physical conditions. (Tr. 176.) Plaintiff's medical records for each are summarized below.

### i. Mental Impairments

Plaintiff's records show that he received regular mental health treatment from three different physicians. From March 31, 2009 to June 10, 2010, Plaintiff saw Dr. Fatma Reda, MD, and from April 27, 2011 to, at least, January 2, 2013, Plaintiff has been under the care of Dr. Victoria Buoen, MD, and Mr. Michael Hitzelberger, MA, LP. (Tr. 241–74; 287; 364; 555.) Plaintiff also received mental health treatment from physicians with the Fairview Clinics and Mercy Hospital on an infrequent basis. (Tr. 313; 318; 333; 409–19; 535–38.) In addition to treatment, Plaintiff was also given three mental health evaluations. The first, administered in August 2009 by Susan Storti, PhD, and Amy Hilburger, PsyD, was a neuropsychological evaluation measuring Plaintiff's ability to transition to a college-level learning environment. (Tr. 228.) The second assessment,

administered on May 27, 2011, was the Minnesota Multiphasic Personality Inventory-2 test, which is a diagnostic tool. (Tr. 501.) The last examination, administered in January 2012 by Nina Syverson, MA, MSE, was a neuropsychological evaluation undertaken on a referral from Plaintiff's treating therapist, Mr. Hitzelberger, who was concerned that Plaintiff could have a thought disorder. (Tr. 522.) Plaintiff's mental health records are examined in turn.

### 1. Treating Physicians
#### a. Dr. Fatma Reda, MD

Plaintiff was referred to treatment with Dr. Fatma Reda by his therapist, Nicole Grages. (Tr. 273–74.) In that initial referral, Ms. Grages indicated that Plaintiff had previous been taking Celexa for his symptoms, but that it made him feel worse, and that he had started cutting. (Tr. 274.)  She gave him a GAF score of 52 at the time of referral. (*Id.*)

Over the course of his treatment under Dr. Fatma Reda at Affiliated Counseling Center, spanning from March 31, 2009 to June 3, 2010, Plaintiff's condition improved dramatically. (Tr. 241–74.) In the first few months of treatment, Plaintiff reported depression, anxiety, difficulty sleeping, and obsessive compulsive disorder. (Tr. 257–74.)  Plaintiff also reported a reluctance to take medication for his ailments. (Tr. 255.) During his last treatment session with Dr. Reda, Plaintiff indicated that his mood and motivation levels had greatly improved, and that he was able to sleep through the night without difficulty. (Tr. 241.) During the period he was being seen by Dr. Reda, Plaintiff graduated from

high school, completed two semesters of community college, and planned to return for a second year. (*Id.*) After Plaintiff's final appointment with Dr. Reda, there is no record of Plaintiff's mental issues until March 19, 2011, when Plaintiff made an appointment with the Fridley Clinic to discuss his issues with anxiety and depression. (Tr. 318.) Five weeks later, on April 27, 2011, Plaintiff began seeing Michael Hitzelberger, MA, LP with the North Suburban Counseling Center. (Tr. 287.)

### b.  Mr. Michael Hitzelberger, MA, LP

In his initial appointment with Mr. Hitzelberger, Plaintiff was found to have symptoms of schizoaffective disorder, major depression with psychotic features, and ADD/ADHD NOS. (Tr. 288–90.) He assessed Plaintiff to have a GAF score of 50.[1] (Tr. 290) Plaintiff entered a treatment relationship with Mr. Hitzelberger the next day, April 28, 2011. (Tr. 291.) As part of his intake as a client, Plaintiff and Mr. Hitzelberger created an individual treatment plan. (*Id.*) In that Plan, Plaintiff identified his goal for treatment as increased motivation and optimism, as well as less anxiety. (*Id.*) He identified eating breakfast in the morning and singing on his own as outcome criteria. (*Id.*) As part of initial treatment, Mr. Hitzelberger recommended that Plaintiff undergo MMPI testing. (*Id.*)

---

[1]  GAF stands for Global Assessment of Functioning.  GAF is a numeric scale used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults, *e.g.*, how well one is adapting or relating to various living issues and problems.  Google, http://wikipedia.org/wiki/Global_Assessment _of_Functioning (last visited May 6, 2015).

On September 12, 2011, Mr. Hitzelberger submitted an opinion letter and Mental Residual Functional Capacity Questionnaire discussing his treatment of Plaintiff, and impressions of Plaintiff's mental health. (Tr. 373–76.) In the letter, Mr. Hitzelberger indicated that Plaintiff had been diagnosed with Schizoaffective Disorder, Generalized Anxiety Disorder, and ADD/ADHD, NOS. (Tr. 373.) Mr. Hitzelberger explained that, "For the most part, people with these disorders can have great difficulty sustaining employment without significant support," but that he "did not make statements regarding [Plaintiff's] specific ability to sustain competitive employment." (*Id.*) He recommended Plaintiff find an alternative treatment source to receive a work assessment. (*Id.*)

On the Mental Residual Functional Capacity Questionnaire, Mr. Hitzelberger noted that he had been in weekly contact with Plaintiff since April, 27, 2011, though the record does not contain records from those meetings. (Tr. 374.) He indicated his belief that Plaintiff's mental health was not impacted by any physical impairment or medical condition, and that Plaintiff's mental health impairments had lasted over twelve months. (*Id.*) In response to a question asking for Plaintiff's highest GAF score over the past year, he answered 44. (*Id.*)

Mr. Hitzelberger assessed Plaintiff as having marked limitation in his ability to: maintain attention and concentration for more than two hour segments; work in coordination with or proximity to others without being distracted; make simple work-related decisions, complete a normal work-day and work-week without interruption from psychologically based symptoms, and perform at a consistent

pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and tolerate normal levels of stress. (*Id.*) He also provided his opinion that Plaintiff had moderate limitation in his ability to ask simple questions or request assistance, and respond appropriately to changes in the work setting. (*Id.*) He found only mild limitation in Plaintiff's ability to travel in unfamiliar places, use public transit, get along with coworkers, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness (*Id.*)

Mr. Hitzelberger noted that Plaintiff's neuropsychological assessment from 2009 "may need to be redone", that Plaintiff should receive a work assessment, and that he could not determine whether Plaintiff would need unscheduled breaks or absences from work. (Tr. 375–76.) Mr. Hitzelberger did indicate that Plaintiff had a medically documented history of mental illness for more than two years, and that a minimal increase in mental demands or change in environment would be predicted to cause decompensation. (*Id.*)

### c. Dr. Victoria Buoen, MD

On September 1, 2011, after filing for SSDI benefits, Plaintiff began seeing Victoria Buoen, MD. (Tr. 364.) In the Psychiatric Diagnostic Assessment Dr. Buoen completed on Plaintiff's initial visit, she indicated that Plaintiff had previously been on a number of medications, including Luvox, BuSpar, Celexa, and Adderall. (Tr. 366–67.) Plaintiff reported that he thinks about suicide "most days," but denied any intent to act on his thoughts. (Tr. 366.) Dr. Buoen

diagnosed plaintiff with Schizoaffective disorder, anxiety disorder, and attention deficit hyperactivity disorder. (Tr. 367.) Dr. Buoen also noted that Plaintiff was suffering from moderate to severe psychosocial stressors, and she gave Plaintiff a GAF score of 44. (*Id.*) Dr. Buoen gave Plaintiff a prescription for Ativan, an anti-anxiety medication, which Plaintiff was instructed to take as needed. (Tr. 368.) Dr. Buoen indicated her hope that Plaintiff become more willing to try other medications to address his non-anxiety symptoms. (*Id.*)

Over the course of his next two meetings with Dr. Buoen, Plaintiff's condition declined precipitously. (Tr. 369–70.) On October 5, 2011, Plaintiff stated that he found the Ativan helpful. (Tr. 369.) He also reported avoiding people and connecting with them, and denied seeing things. (*Id.*) He denied any suicidal thoughts or intentions. (*Id.*) Just over two weeks later, however, on October 20, 2011, Plaintiff expressed to Dr. Buoen that he did not trust himself to refrain from self-harm, and that he felt an underlying anger and desire to harm others. (Tr. 370.) Because of Plaintiff's statements, Dr. Buoen referred him to Mercy Hospital for possible hospitalization. (*Id.*; 409–23.)

Plaintiff returned to treatment with Dr. Buoen on November 3, 2011. (Tr. 430.) He told Dr. Buoen in that meeting that he felt less suicidal and less stressed than he did before, and slightly more hopeful. (*Id.*) He related that he had begun taking singing lessons over Skype from a singer in New York. (*Id.*) Plaintiff indicated that it was still difficult for him to focus. (*Id.*) Over the course of his next two meetings with Dr. Buoen, occurring on December 7 and 21, 2011,

9

Plaintiff reported excessive sleep, increased anxiety, and some suicidal ideation associated with his prescription for Remeron. (Tr. 520–21.) As a result, Dr. Buoen discontinued Plaintiff's prescription for Remeron and restarted him on Ativan to address his anxiety issues. (*Id.*)

In his next meeting with Dr. Buoen, on February 1, 2012, Plaintiff indicated that he felt like quitting therapy. (Tr. 527.) He discussed experiencing a visual hallucination, but Dr. Buoen reported that Plaintiff was unwilling to take antipsychotic medication. (*Id.*) At Plaintiff's next two visits to Dr. Buoen, he reported continuing visual hallucinations. (Tr. 528–29.) He also reported feeling "up" and "down", with the "up" feeling generally occurring on sunnier days. (Tr. 529.)

Starting with his April 17, 2012 meeting with Dr. Buoen, Plaintiff began reporting improved mood. (Tr. 530.) In his appointments with Dr. Buoen over the next four months, Plaintiff indicated that he was doing well, and that he was increasing his contact with people and enjoying it. (Tr. 531–33.) He reported decreased difficulty sleeping and a decreased need to take Ativan for his anxiety. (*Id.*) However, by his last session with Dr. Buoen on November 7, 2012, Plaintiff noted that he was feeling increased anxiety and that he found all social interaction to be unrewarding. (Tr. 534.)

In a letter written in support of Plaintiff's SSDI benefits claim, dated January 2, 2013, Dr. Buoen related Plaintiff's diagnoses of Schizoaffective Disorder, Generalized Anxiety Disorder, and his symptoms of Schizotypal

10

Personality Disorder. (Tr. 555.) She outlined his symptoms as including

depression, social awkwardness, unusual thinking, abnormal perceptions, and

some auditory and visual hallucinations. (*Id.*) She noted Plaintiff's October 2011

hospitalization at Mercy Hospital, crediting it to "unrelenting suicidal and

homicidal ideation", and provided that suicidal ideation had been present on and

off. (*Id.*) She described Plaintiff's experience with different medications,

explaining that he had some success with anti-anxiety medications, responded

poorly to anti-depressants, and was unwilling to try anti-psychotics. (*Id.*) She

reported that Plaintiff was generally motivated to help himself in ways that did not

involve medication, and that he had a high intelligence, but that he had failed in

his efforts to attend school or obtain a job. (*Id.*) Because of Plaintiff's history of

mental illness and his "profound inability to function in society despite his and

others efforts," Buoen stated her support for Plaintiff's Social Security Disability

claim. (*Id.*)

### 2.  Mental Health Evaluations
#### a.  2009 Neuropsychological Assessment

On August 4 and 11, 2009, Plaintiff was given a neuropsychological

assessment by Amy Hilburger, PsyD, and Susan Storti, PhD, LP, CCC, with the

Learning Language Specialists. (Tr. 229–40.) Plaintiff underwent formal testing of

general cognitive ability, cognitive processing skills, and behavioral and

emotional functioning. (*Id.*) Accord to Drs. Hilburger and Storti, the results of

testing showed that Plaintiff possessed superior general intellectual abilities, with

an IQ in the 97th percentile, and average cognitive processing ability. (*Id.*) He displayed evidence of persistent and longstanding Attention Deficit/Hyperactivity Disorder, with significant emotional difficulties also impacting his functioning. (*Id.*) Plaintiff's results also revealed reduced learning efficiency, stemming from difficulties with planning, cognitive organization, retrieval of information, and reading rate and comprehension. (*Id.*) Drs. Hilburger and Storti concluded that Plaintiff was suffering from longstanding symptoms of depression and anxiety, which, in conjunction with his attention issues, led to chronic academic underachievement. (*Id.*) They provided a list of suggestions for accommodation which would help him establish a positive attitude toward academics, increase confidence, and maximize his potential. (*Id.*) In addition to suggesting that Plaintiff consult with and receive treatment from a psychiatrist for his attention difficulties as well as his anxiety and depression, the evaluation recommended, *inter alia*, that Plaintiff work closely with student services, receive test taking accommodations, including extended time, and seek the help of tutors to assist with his comprehension and review of material. (*Id.*)

### b. Minnesota Multiphasic Personality Inventory-2 Testing

The MMPI results indicated that individuals with Plaintiff's response profile are suffering from "a pattern of chronic maladjustment," and are "overwhelmed by anxiety, tension, and depression." (Tr. 501–07.) His responses also evidenced considerable difficulties in carrying on normal interpersonal relationships, and that he was shy and emotionally distant. (Tr. 506.) This shyness was posited to

be symptomatic of a broader pattern of social withdrawal. (*Id.*) Plaintiff's profile tended to show that he had a severe psychological disorder, and would probably be diagnosed as severely neurotic with an Anxiety Disorder or Dysthymic Disorder in a Schizoid Personality, with the possible existence of a more severe disorder, such as Schizophrenic Disorder. (Tr. 507.) Addressing treatment considerations for individuals with Plaintiff's response profile, it was suggested that Plaintiff would need intensive therapy, as well as medication. (*Id.*) Individuals with Plaintiff's profile were described as presenting a "clear suicide risk", and the interpretive report suggested that precautions be taken. (*Id.*)

The MMPI-2 interpretive report stated that Plaintiff's profile was probably valid. (Tr. 505.) It did express some concern, though, that his approach was inconsistent, and that he could have answered questions in the latter portion of the examination in an exaggerated manner. (*Id.*) The report related that this behavior could have invalidated the latter portion of the test, and suggested that caution be used when interpreting the content and supplementary scales. (*Id.*)

### c. 2012 Psychological Evaluation

In January 2012, Plaintiff saw Nina Syverson, MA, MSE, for a neuropsychological evaluation. (Tr. 522.) Plaintiff was referred for testing by Mr. Hitzelberger because of concerns that Plaintiff may have a thought disorder. (*Id.*) During the evaluation, Plaintiff reported a number of perceptual distortions, and stated that he felt alone, and separate from others. (Tr. 522–23.) He explained that he did not remember a time that he was not depressed, and that he had

13

great difficulty concentrating or trusting others. (*Id.*) He reported that he was unemployed, and that he discontinued previous attempts at working because he found them to be too stressful. (Tr. 523.) Plaintiff stated that he was taking Ativan, but was unsure of whether it was helpful. (*Id.*)

Evaluating the results of testing, Ms. Syverson found that Plaintiff presented with problems with his thought process, evidenced by his conversation and the results of the BASC-2 and Rorschach tests. (Tr. 525–26.) The other test results showed that Plaintiff was significantly depressed, and suffering from a great deal of distress. (Tr. 524–26.) Tests previously administered showed Plaintiff to possess superior intellectual capacity, but his thought process issues were believed to significantly interfere with Plaintiff's ability to succeed. (Tr. 525–26.) In addition, Plaintiff's thought process problems were believed to significantly interfere with his ability to form and maintain relationships. (*Id.*) Ms. Syverson recommended that Plaintiff continue therapy, and expressed her belief that he would do best in jobs that do not require significant social interaction. (Tr. 526.) She diagnosed Plaintiff with Schizophrenia and Major Depressive Disorder, Recurrent, with moderate severity, and she gave him a GAF score of 50. (*Id.*) Ms. Syverson expressed that the test results could not be presented with absolute certainty because of the limitations of the testing process, as well as the unreliability of self and third-party reporting. (*Id.*) However, she believed that Plaintiff was cooperative and put forward his best effort during assessment, and

that the results were likely a valid estimate of Plaintiff's functioning at the time of examination. (Tr. 523.)

### 3. Plaintiff's Other Treatment Records
#### a. Mercy Hospital

Dr. Carly Evans, MD, admitted Plaintiff to Mercy Hospital via the emergency department on October 20, 2011, because of suicidal ideation, and a depression disorder. (Tr. 411–18.) During Dr. Evans' initial examination of Plaintiff, she noted that he had a history of schizoaffective disorder and had previously attempted suicide. (Tr. 412.)  As part of his admittance, Plaintiff was required to complete Mental Health Assessment and Referral with Cynthia Dasch, LICSW. (Tr. 414–17.) When Ms. Dasch asked Plaintiff why he had been admitted to Mercy, he stated that he had "been thinking about doing it", and reported plans to commit suicide by poisoning, cutting his own wrists, or through use of a gun. (Tr. 414.) Plaintiff reported that he had previously attempted suicide by wrist-cutting when he was fourteen, and stated that he had engaged in self harm the night before the hospitalization by biting and pinching himself, as well as pulling his hair. (*Id.*) He told Dasch that his only reason for not committing suicide was that he enjoyed making music. (*Id.*) He reported general helplessness and hopelessness, and a feeling of constant sadness and worthlessness. (*Id.*) Specifically, Plaintiff noted that his depression had been getting worse over the previous two months, and that he had been suffering anxiety related panic attacks "all of the time." (Tr. 415.) He presented with no

symptoms of mania, but did describe occasionally feeling like people were trying to hurt or "screw with him." (Tr. 416.) Because of Plaintiff's comments during the Assessment, Dr. Evans admitted Plaintiff into Mercy's inpatient psychiatric unit on a seventy-two hour hold. (Tr. 412–13.)

The following day, October 21, 2011, Plaintiff was examined by Dr. Muhammad Khan. (Tr. 419–23.) Dr. Khan reported that Plaintiff denied suffering from Schizoaffective Disorder. (Tr. 420.) Plaintiff described suffering physical and mental abuse throughout his life at the hands of his father. (Tr. 419–20.) Plaintiff reported feeling depressed for the previous two weeks, but denied feeling suicidal or having any plans or intents. (Tr. 420.) He described worrying excessively for most of his life, and feeling restless. (*Id.*) Plaintiff indicated that he struggled with concentration and sleep issues. (*Id.*) He noted that he used to suffer from panic attacks, but that they had gone away. (*Id.*) He denied feeling any compulsions or obsessive thinking, other than occasionally checking doorknobs or thinking about his music. (*Id.*) He denied hearing voices, or seeing things that were not there, but reported once feeling that spirits would "go and get him." (Tr. 421.) Plaintiff reported previously using Luvox, Celexa, and Effexor, and current usage of Ativan, prescribed by his psychiatrist, Dr. Buoen. (*Id.*) Based on his evaluation of Plaintiff, Dr. Khan diagnosed plaintiff with recurrent moderate to severe, nonpsychotic Major Depressive Disorder, Generalized Anxiety Disorder, and Post-traumatic Stress Disorder. (Tr. 422.) He gave Plaintiff a GAF score of 30. (*Id.*) Dr. Khan convinced Plaintiff to begin a prescription of the

antidepressants Remeron and Klonopin, and discontinued Plaintiff's prescription for Ativan. (Tr. 423.) He also convinced Plaintiff to try attending the outpatient group therapy sessions held at Mercy as part of his continuing treatment after discharge. (*Id.*)

Four days later, on October 25, 2011, Plaintiff was discharged from Mercy Hospital. (Tr. 409–11.) Dr. Khan diagnosed Plaintiff with recurrent Major Depressive Disorder, which had gone into partial remission, as well as Generalized Anxiety disorder and Post-traumatic Stress Disorder. Plaintiff endorsed symptoms of depression, but repeatedly denied experiencing any symptoms association with Schizoaffective Disorder. (Tr. 410.) He also denied any suicidal or homicidal ideation, intents, or plans. (*Id.*). Dr. Khan noted that Plaintiff had initially been isolative during his stay at Mercy, but had later started going to groups, being social, and making friends. (*Id.*) Dr. Khan gave Plaintiff a GAF score of 55, and placed him on his preadmission medication, as well as Klonopin and Remeron. (Tr. 409–10.).

Following his discharge, Plaintiff attended group therapy at Mercy on November 14, 2011, and December 12, 2011. (Tr. 535–39.) During the latter session, Plaintiff reported that he struggled to get out of bed in the morning, and felt unmotivated. (*Id.*) Plaintiff did not return after his second session, and was discharged from outpatient group therapy with the recommendation that he continue receiving treatment from his psychiatrist and therapist (*Id.*)

17

### b. Fairview Clinics

Plaintiff received mental health treatment from physicians with the Fairview Clinics on three occasions. (Tr. 313; 318; 334.)

First, on February 19, 2009, Plaintiff saw Janice Hassumani, MD, because of issues with sleeping, anxiety, and concentration. (Tr. 334.) Dr. Hassumani observed that Plaintiff exercised, lifted weights, and ate well. (*Id.*) She encouraged him to take melatonin to help with sleep, noting that Plaintiff was resistant to taking antidepressants. (*Id.*).

Plaintiff next received treatment for his anxiety and depression from Dr. Thomas Barringer, MD, on March 19, 2011. (Tr. 318–19.) Plaintiff reported that his depression had become worse over the two months preceding his appointment with Dr. Barringer, and that he had stopped taking BuSpar for his anxiety six months prior. (Tr. 318.) Dr. Barringer noted that Plaintiff had a girlfriend at the time of treatment. (*Id.*) Dr. Barringer wrote Plaintiff a prescription for Zoloft to help with his anxiety and depression, and requested that Plaintiff return to care or phone him within three weeks. (Tr. 319.) The record does not show if Plaintiff complied with Dr. Barringer's request, but it does reflect that Plaintiff entered Mr. Hitzelberger's care a little over a month later. (Tr. 287.)

### ii. Physical Impairments

Plaintiff has received treatment for a number of physical ailments, the most serious of which include headaches, abdominal pain, and Gastroesphogeal Reflux Disease ("GERD"). Plaintiff has also received treatment for a number of

other issues, including: ongoing issues with weight, issues with throat and vocal pain associated with poor singing technique, back pain, knee pain, hip pain, foot pain, and a dog bite. (Tr. 315; 326; 329; 335; 338; 483–85; 540; 549.)  At the time of Plaintiff's application for SSDI benefits, he identified ongoing issues with tension headaches and stomach pain. (Tr. 176.)

Plaintiff was first treated for headaches associated with neck pain on August 27, 2009, at Fairview Medical Clinic. (Tr. 353.) As part of his treatment, he identified the goals of turning his head without pain, sleeping without pain, and restoring normal range of motion. (*Id.*) At the conclusion of treatment in early 2010, Plaintiff's physical therapist indicated that all goals had been met, and that Plaintiff was very pleased with the results of treatment. (Tr. 346.)

Plaintiff next complained of headaches associated with neck pain in a March 19, 2011 appointment with Dr. Thomas Barringer at the Fridley Fairview Clinic. (Tr. 318.) Dr. Barringer's notes show that Plaintiff scheduled the appointment to discuss his issues with anxiety and depression, but that during the visit Plaintiff reported that he had bad headaches two to three times a week, and that he had neck pains that worsened his headaches. (*Id.*) Dr. Barringer directed Plaintiff to use ibuprofen to treat his headaches, and noted that further examination might be necessary. (*Id.*) Plaintiff has no further record of headaches associated with his neck pain.

Plaintiff's treatment for abdominal pain and GERD was more extensive. He first reported feeling stomach discomfort and pain in August 2008, and continued

19

to seek treatment for these issues a number of times through September 12, 2012. (Tr. 325; 335–38; 473–87; 540.)  Plaintiff's treating physician, Dr. Pragati Pandey, MD, noted that Plaintiff has been suffering from GERD and abdominal pain for a number of years. (Tr. 485.) At times, Plaintiff complained that his pain could be incapacitating and accompanied by vomiting and diarrhea. (Tr. 335.) Tests conducted to investigate the source of Plaintiff's issues revealed only mild gastritis, and otherwise normal functioning. (Tr. 487.) Over the course of his treatment, Plaintiff was directed to take certain medications, receive treatment from a specialist, and make prescribed lifestyle changes, but often he did not comply, or only did so infrequently. (Tr. 325; 335–38; 473–87; 540.)

### B.  State Agency Consultant Opinions

### i.  Dr. DeSanctis Initial Mental Review

On September 27, 2011, Dr. Michael DeSanctis, PhD, ABPP, LP reviewed Plaintiff's social security disability file at the request of the SSA. (Tr. 377.) Dr. DeSanctis completed a Psychiatric Review Technique Form, and a Mental Residual Capacity Form for Plaintiff, finding that Plaintiff suffered from a severe psychological impairment, but that it did not meet or equal a listed disability for purposes of SSDI eligibility. (Tr. 377–96.) Dr. DeSanctis noted on the Psychiatric Review Technique Form his assessment that Plaintiff had mild functional limitation in his ability to engage in the activities of daily living, and that Plaintiff had moderate limitation in his ability to maintain social functioning, and his ability to maintain concentration, persistence, or pace. (Tr. 339.) On the Mental

Residual Functioning Capacity Assessment, Dr. DeSanctis described these limitations, noting that Plaintiff would still be able to follow limited detailed instructions, sustain reasonable persistence and pace at three and four-step routine, repetitive tasks, tolerate brief and infrequent contact with coworkers and the general public, and tolerate and appropriately respond to the ongoing pressures typical of a routine, repetitive, three and four-step entry level work environment. (Tr. 396.) Dr. DeSanctis found Plaintiff's statements of alleged functional limitation to be reasonably credible because of their proportionality to his documented illnesses and treatment. (Tr. 392.)

### ii.  Dr. Salmi Initial Physical Review

On September 30, 2011, Dr. Gregory Salmi, MD, reviewed Plaintiff's application for evidence of physical impairment or limitation. Dr. Salmi found that Plaintiff had not indicated any physical limitations on his SSDI application, and that his medical records, while showing the Plaintiff suffered from GERD and headaches, did not show any functional limitations. (Tr. 399.) Dr. Salmi concluded that Plaintiff's physical impairments were non-severe, and did not qualify him for SSDI benefits. (*Id.*)

### iii.  Dr. Boyd Mental Review on Reconsideration

After Plaintiff's initial application was denied and he applied for reconsideration, the SSA requested that Dr. Jeffrey Boyd review Plaintiff's records, including new records from the period after Dr. DeSanctis's review. (Tr. 435–54.) Completed on November 16, 2011, Dr. Boyd affirmed Dr. DeSanctis's

initial assessment of Plaintiff, finding that Plaintiff suffered from a Severe Mental Impairment which did not meet or equal a listed condition, and that he suffered from moderate functional limitations which did not preclude all forms of employment. (Tr. 450.) Regarding Plaintiff's psychological admission to Mercy Hospital because of suicidal statements, Dr. Boyd found that it was not evidence showing a decline in functioning since the initial review. (*Id.*) On the Mental Residual Functional Capacity Assessment, Dr. Boyd found that Plaintiff would not be significantly limited in his ability to concentrate on, understand and remember instructions, his ability to handle supervision, or his ability to carry out routine, repetitive and three and four-step tasks. (Tr. 454.) He noted that Plaintiff's ability to handle stress and co-worker and public contact would be reduced but adequate for a routine, repetitive, three to four-step setting, and that Plaintiff would be markedly limited in his ability to handle a detailed, complex, or technical work setting. (*Id.*) Dr. Boyd felt Plaintiff's statements about his limitations were credible when considered in light of his medical record. (Tr. 450.)

### iv.  Dr. Richards Physical Review on Reconsideration

Dr. Steven Richards completed a review of Plaintiff's Physical health records on November 22, 2011, finding that his initial lack of physical impairment or limitation had not changed since initial assessment and denial. (Tr. 457.)

### III.     Testimony at Administrative Hearing

#### A. Plaintiff's Testimony

After Plaintiff's benefits application was denied on reconsideration, he requested a hearing in front of an Administrative Law Judge. (Tr. 99.) At that hearing, held on January 16, 2013, Plaintiff amended his alleged onset of disability from January 1, 2005 to July 22, 2011. (Tr. 12–13.)  Plaintiff testified that he lived with his parents, and that he had been employed in July 2011, working as a canvasser. (Tr. 14–15.) Plaintiff testified that he quit that position two weeks after it began, citing unbearable anxiety. (Tr. 15.)

Plaintiff then testified about his symptoms. Regarding his diagnosis of Obsessive Compulsive Personality Disorder, Plaintiff stated that his "thinking [was] very obsessive", and that he "obsess[ed] every day." (Tr. 15.) He testified that he was often unable to read, carry on normal conversation, or sleep as a result. (*Id.*) Specifically, Plaintiff described how his obsessive thinking made it difficult for him to write papers for school because he was too much of a perfectionist, and that he often did not finish or turn in his papers because of a fear of being judged. (Tr. 15–16.) He stated that he did not notice any difficulty in his ability to function at home that was specifically related to his diagnosis of obsessive compulsive disorder. (Tr. 16.)

Plaintiff next addressed his weight and anxiety issues, explaining that he had been underweight for a long period of time and that he had difficulty eating because of stomach pain. (*Id.*) He described how he would occasionally not eat

even though food was available because he worried it was not healthy enough. (*Id.*) Speaking on his anxiety problems, Plaintiff described suffering from panic attacks, and daily anxiety which prevents him from leaving his room, sleeping, and being around others, including his parents. (Tr. 16–17.)

Plaintiff also testified about his experience with visual hallucinations, paranoid thinking, and schizophrenia. (Tr. 17–18.) He related that he once felt like someone was messing with him and that everything around him was not real. (*Id.*) Specifically, Plaintiff described how he felt like a water tower appeared where it had not been before, and that someone had put it there to mess with his head. (Tr. 17.) Plaintiff also explained how he would occasionally look in the mirror only to have his reflection appear to be distorted and making expressions independent of Plaintiff's own action. (Tr. 17–18.) Plaintiff discussed feeling terrible and like something was very wrong with him when he was first diagnosed with Schizophrenia, and explained that he was reluctant to take anti-psychotic medication because he felt it served as a continual reminder that he was not normal. (Tr. 18.) Plaintiff testified that Dr. Buoen was discussing different medications with him, and that he was considering taking them, but that he felt that they would not help. (Tr. 20.) He mentioned that he was taking Ativan for his anxiety, and that it helped control his symptoms. (Tr. 21.)

Plaintiff then discussed his ability to function in school and in society generally, explaining that his perfectionism made it difficult to complete schoolwork, and that because of anxiety he was forced to drop out. (Tr. 15–16;

18–19.) Plaintiff explained that he had taken Taekwondo lessons for eight months as part of an effort to socialize more and address some of his paranoia about being attacked whenever he left home. (Tr. 19; 21–22.) He quit going to lessons, however, because he was unable to tolerate being in the presence of the four other people in the class. (Tr. 19.)

Plaintiff also discussed his fear of driving, stating that while he had occasionally driven himself to his Taekwondo lessons, the grocery store and once to school, he only did so rarely because he felt he was a bad driver and he found driving on the highway to be terrifying. (Tr. 25–26.) Plaintiff noted that his parents took care of most of his living expenses, aside from food he bought with food stamps and a cell phone he paid for with money he received as gifts on holidays and his birthday. (Tr. 26–27.) When asked if he felt he could succeed in a job where he was not required to speak with other people, he responded that he felt he would not be able to because his perfectionism made it impossible for him to complete tasks. (Tr. 20.)

### B. Vocational Expert's Testimony

William Rutenbeck testified at the ALJ hearing as a vocational expert. (Tr. 27–32.) The ALJ asked him a hypothetical question as to whether an individual of Plaintiff's age, education, with no relevant work experience, and with Plaintiff's limitations – routine, repetitive, three to four-step tasks, brief and infrequent contact with coworkers and the public – could perform in any occupations. (Tr. 28–29.) Rutenbeck stated that the hypothetical individual would be most suited to

various cleaning positions, providing the examples of a janitor cleaner, a vehicle cleaner, and a housekeeper cleaner. (Tr. 29–30.)

Building on the initial hypothetical, the ALJ asked Rutenbeck what impact an individual's inability to stay on task over the course of an eight hour work period would have on that individual's prospects in the listed occupations or employment generally. (Tr. 30.) Rutenbeck responded that an individual who was off task for more than a short period during the workday would struggle to perform in the suggested jobs. (Tr. 30–31.) Continuing, the ALJ asked what impact an individual's susceptibility to tardiness or absenteeism would have on the listed occupations, and employment generally. (*Id.*) Rutenbeck responded that if an individual's symptoms would lead to tardiness or absences more than twice a month, that person would be precluded from the example occupations. (*Id.*)

## IV.   The ALJ's Findings and Decision

On February 26, 2013, the ALJ issued a decision denying Plaintiff's application for SSDI benefits, holding that Plaintiff was not disabled from his amended alleged onset date of July 22, 2011. (Tr. 37.) The ALJ followed the five-step sequential evaluation process set out in the Code of Federal Regulations. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Eight Circuit has summarized the five-step evaluation process as comprising five separate inquiries: (1) whether the claimant is currently engaged in "substantial gainful activity; (2) whether the claimant suffers from a severe impairment that "significantly limits

the claimant's physical or mental ability to perform basic work activities"; (3)

whether the claimant's impairment "meets or equals a presumptively disabling

impairment listed in the regulations (if so, the claimant is disabled without regard

to age, education, and work experience)"; (4) "whether the claimant has the

residual functional capacity ["RFC"] to perform his or her past relevant work"; and

(5) if the ALJ finds that the claimant is unable to perform his or her past relevant

work then the burden is on the Commissioner "to prove that there are other jobs

in the national economy that the claimant can perform." *Fines v. Apfel*, 149 F.3d

893, 894–95 (8th Cir. 1998) (internal citation omitted).

The ALJ found that the Plaintiff's brief period of work after the alleged

disability onset date did not rise to the level of substantial gainful activity. (Tr. 39.)

At step two, the ALJ found that Plaintiff had the following severe mental

impairments: "Attention Deficit Hyperactivity Disorder, Schizophrenia/

Schizoaffective Disorder, Major Depressive Disorder, Generalized Anxiety

Disorder, and Personality Disorder, NOS [Not Otherwise Specified]." (Tr. 39–40.)

The ALJ noted that Plaintiff's diagnosis of Learning Problems, NOS, was not

independently established by the record and appeared to stem from his

established severe impairments. (Tr. 40.) The ALJ also found that the evidence

did not establish that Plaintiff suffered from any severe physical impairment. (Tr.

40–41.) Noting that Plaintiff reported mowing the lawn, taking biweekly

Taekwondo classes, bodybuilding, and singing for an hour a day, the ALJ held

that the record did not show that Plaintiff's alleged impairments impacted his

ability to perform work-related activities more than minimally. (*Id.*) The ALJ gave great weight to the opinions of the State Agency medical consultants finding no impairment, because those consultants "have specialized knowledge in assessing impairments within the SSA standard for disability and their opinions are consistent with the whole record". (Tr. 41.)

At step three, the ALJ determined that Plaintiff's mental impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 41.) Specifically, the ALJ found that Plaintiff did not meet the "paragraph B" criteria of listings 12.02, 12.03, 12.04, 12.06, or 12.08, or the "paragraph C" criteria. (Tr. 42–44.) To satisfy the "B criteria", Plaintiff needed to establish that his mental impairments resulted in at least two of the following: marked restriction in his ability to take part in the activities of daily living; marked difficulty in maintaining concentration, persistence or pace; marked difficulty in maintaining social functioning; or repeated episodes of decompensation. (Tr. 42.)

Pointing to Plaintiff's testimony indicating that he wrote songs, played guitar, sang daily, read, took Taekwondo lessons, occasionally drove, attended college courses, and was able to handle his own finances, the ALJ found that the Plaintiff had only mild restriction in the activities of daily living. (Tr. 42.) Addressing Plaintiff's claims that it was difficult for him to leave the house, socialize, drive, sleep and read because of his anxiety, the ALJ noted that he had no difficulty performing self-care, preparing meals, and that he reported regularly mowing the lawn, singing and playing instruments, and spending time with

friends. (*Id.*) The ALJ also highlighted that Plaintiff's scores on the Behavior

Assessment System for Adolescents-2 (BASC-2) test, which solicited ratings of

Plaintiff's behavior and development from teachers and his mother, were in the

normal range. (Tr. 42.)  Plaintiff's mother indicated in the BASC-2 that she felt

Plaintiff did not meet the standards of personal independence and social

responsibility expected of persons of Plaintiff's age group, but significant

impairment was not reflected in the teachers' ratings. (Tr. 42.) After resolving

inconsistencies, the ALJ found that the whole record supported only mild

restriction. (*Id.*)

Next addressing social functioning, the ALJ noted Plaintiff's fear of

interacting with others, his poor eye contact and posture, and his difficulty leaving

the house and interacting with his parents. (Tr. 42–43.) The ALJ then reviewed

Plaintiff's reports of having a girlfriend, spending time with and, for a period of

time living with, friends, leaving the home alone to shop a few times a week, and

his statement that he was able to get long with almost everyone. (*Id.*) Resolving

the inconsistencies in the evidence, the ALJ found moderate restriction in social

functioning.  (Tr. 43.)

With regard to concentration, persistence or pace, the ALJ found that

Plaintiff had moderate difficulties. (Tr. 43.) The ALJ based this judgment on

Plaintiff's testimony indicating that he wrote songs and played guitar, sang daily,

read, took Tae Kwon Do, drove occasionally, attended college classes, handled

his own finances, and was able to leave home a few times a week and interact

with others without the need for assistance or encouragement. (*Id.*) The ALJ noted that Plaintiff testified that he struggled completing simple assignments because of difficulty concentrating. (*Id.*) The ALJ also discussed Plaintiff's test results, mentioning Plaintiff's superior intellectual, perceptual, and verbal functioning as indicated by the WAIS-IV test, his variability in attention, his average ability to stay on task and discriminate in attention, and highlighting that his memory and cognitive functioning was generally normal when Plaintiff was complying with treatment. (Tr. 43.) Taking the record as a whole, the ALJ found moderate restriction in Plaintiff's ability to sustain concentration, persistence, and pace. (Tr. 43–44.)

Pointing to Plaintiff's October 2011 hospitalization, the ALJ found that Plaintiff had suffered from one episode of decompensation. (Tr. 44.) Because Plaintiff did not suffer from either two marked limitations, or one marked limitation and repeated episodes of decompensation, the ALJ ruled that the "paragraph B" criteria were not satisfied. (*Id.*)

Next considering the "paragraph C" criteria, the ALJ found that the record did not establish the necessary showing that a need for intensive treatment, a highly structure environment, a significant lack of ability to function independently, a complete inability to function outside of the home, or a likelihood of decompensation with minimal stress or change in routine existed. (*Id.*). Because of this lack of evidence, the ALJ ruled that the "paragraph C" criteria were not satisfied. (*Id.*)

The ALJ gave great weight to the opinions of the State Agency psychological consultants on both "paragraph B" and "paragraph C" findings, because of the consultants' "specialized knowledge in assessing impairments within the SSA standard for disability" and because their opinions were "consistent with the whole record . . . indicating the claimant's mental impairments do not meet or equal any listing." (Tr. 44.) Evidence generated subsequent to State Agency review was found insufficient to warrant a change in their conclusions, and was otherwise reflected in the ALJ's step three analysis. (*Id.*)

At step four of the evaluation, the ALJ found Plaintiff has the Residual Functional Capacity to perform:

> a full range of work at all exertional levels but with the following nonexertional limitations: routine, repetitive 3-to-4-step tasks and instructions, brief superficial, and infrequent contact with co-workers and supervisors, no contact with the public, minimal if any workplace changes from day to day, tasks that could be performed independently meaning without requiring teamwork or collaboration to complete the tasks, and tasks that would not require rapid decision-making.

(Tr. 44.) To reach an RFC finding, the ALJ must consider all symptoms as well as the extent to which symptoms can be accepted as consistent with objective medical evidence and other evidence. (Tr. 44–45.) (citing *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). As part of that analysis, the ALJ determines whether there is an underlying medically determinable impairment that could be reasonably expected to produce the claimant's pain or other symptoms. (Tr. 45.)

Then, the ALJ evaluates the intensity, persistence, and limiting effects of those symptoms to determine the extent to which they limit functioning. (*Id.*) If statements about the effect of symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of those statements when considered against the whole record. (*Id.*) (citing 20 C.F.R. §§ 404.1529; 416.929).

In assessing whether Plaintiff symptoms could be reasonable linked to an underlying medically determinable impairment, the ALJ reviewed Plaintiff's testimony regarding his symptoms, including: his difficulties working, sleeping, and interacting with others; his experience with visual hallucinations; his reaction to his schizophrenia diagnosis and his reluctance to take antipsychotic medication and; his feeling that he could not do or complete anything in his life because of his perfectionism. (Tr. 45–46.) Based on that testimony and the rest of the record, the ALJ found that his medically determinable impairments could be reasonably expected to cause the alleged symptoms. (Tr. 46.) When considering the credibility of Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms, however, the ALJ ruled that they were inconsistent with objective medical evidence and other evidence on the record. (*Id.*) Because of these inconsistencies, the ALJ held Plaintiff's statements to be not fully credible. (*Id.*)

In support of this finding, the ALJ emphasized evidence that she felt conflicted with Plaintiff's testimony and weakened his credibility. (*Id.*) The ALJ

32

pointed to Plaintiff's testimony about the various social activities he took part in, and the fact that he was inconsistent in his attendance at therapy and psychiatric treatment. (Tr. 46–47.) The ALJ also noted that Plaintiff had repeatedly discontinued his medication without consulting with his treatment provider. (Tr. 47.) The ALJ completed a full review of Plaintiff's record, and concluded that Plaintiff's intermittent reports of symptoms, his lack of follow-through in treatment, and his statements that he wanted to be a singer and his daily practice toward that goal, when considered together, did not support the alleged severity of Plaintiff's limitations. (Tr. 47–50.)

The ALJ next assessed the relative weight to be given to the opinion evidence. The ALJ determined that the State Agency psychological consultant opinions deserved great weight because the consultants "reviewed the record, [had] specialized knowledge in assessing impairments within the SSA standard for disability and their opinions are consistent with the whole record." (Tr. 50–51.) The ALJ held that the evidence submitted subsequent to State Agency review did not reflect a significant worsening of Plaintiff's condition, particularly in light of Plaintiff's inconsistent compliance with treatment prior to episodes of worsening symptoms, including his October 2011 hospitalization. (Tr. 51.)

The ALJ then addressed Plaintiff's non-treating opinion evidence. The ALJ determined that the opinion evidence stemming from Plaintiff's January 2012 neuropsychological evaluation, and the GAF score of 50 associated with that evaluation, deserved only very limited weight because Plaintiff's reporting of

33

symptoms was not fully consistent with his course of treatment or activities of daily living, and because his noncompliance with treatment likely contributed to his increased depressive symptoms. (Tr. 51.)

The ALJ similarly gave the 2009 neuropsychological evaluation limited weight because of its focus on limitations as pertaining to a college-level academic setting, and not a work-setting, and because it was performed prior to the amended date of onset. (*Id.*) Despite its noted flaws, the ALJ found the results of the 2009 evaluation to be generally consistent with Plaintiff's moderate limitations as assessed by the State Agency consultants, and not with Plaintiff's own statements or testimony. (*Id.*)

Finally, the opinion evidence based on the results of MMPI-2 testing in May 2011 was given less weight because of its excessive reliance on Plaintiff's subjective reporting and the inconsistent response pattern. (Tr. 51.) The also ALJ found that the MMPI-2 interpretive reports' conclusions were inconsistent with Plaintiff's overall functioning, treating, and activities of daily living. (*Id.*)

The ALJ then discussed the opinion evidence of Dr. Buoen and Michael Hitzelberger, Plaintiff's treating psychiatrist and psychotherapist, respectively, finding that each deserved little weight. (Tr. 51–53.) The ALJ first held that Dr. Buoen's letter dated January 2, 2013, was inconsistent with Dr. Buoen's own treatment of patient, as well as Plaintiff's medical record as a whole. (Tr. 51–52.) The ALJ noted that Dr. Buoen did not address the relationship between worsening of Plaintiff's symptoms and his noncompliance with treatment. (*Id.*).

Going further, the ALJ also found that Dr. Buoen's opinion provided no specific information regarding Plaintiff's work-related abilities and limitations, and was generalized and conclusory. (*Id.*)

The ALJ discounted the GAF score Dr. Buoen gave to Plaintiff because it appeared to reflect social and economic factors irrelevant to the SSA disability standard and was not consistent with the record as a whole. (Tr. 52.) The ALJ similarly discounted Dr. Buoen's statements regarding Plaintiff's continual failure to attend school or obtain a job, concluding that Dr. Buoen's reliance on Plaintiff's subjective reporting of these difficulties undermined her claims. The ALJ noted that Plaintiff had not appeared to make significant efforts to work in situations that might better suit his limitations, and as a result his credibility regarding his failure to obtain work was suspect. (Tr. 52.)

Next considering Mr. Hitzelberger's opinion, as contained within the letter and Mental Residual Functional Capacity Questionnaire ("MRFCQ") that Mr. Hitzelberger completed, both dated September 12, 2011, the ALJ found the opinion to be worth little weight. (Tr. 52–53.)  The ALJ noted Mr. Hitzelberger's general reluctance to give his opinion about Plaintiff's workability, placing emphasis on Mr. Hitzelberger's repeated suggestions that Plaintiff receive an occupational evaluation from a different source, and his acknowledgement that Plaintiff's 2009 neuropsychological assessment might need to be redone. (Tr. 52.) Moreover, she determined that Mr. Hitzelberger's opinion, where he did give

35

it, consisted of a generalized description of the employability of individuals who suffer from Plaintiff's diagnoses. (*Id.*)

The ALJ ruled that this nonspecific discussion of limitations and Mr. Hitzelberger's specific findings, contained within the MRFCQ, that Plaintiff suffered from a number of marked limitations in functions were inconsistent with the record as a whole. (Tr. 52–53.) In particular, the ALJ noted that the record did not support Mr. Hitzelberger's claim that a minimal increase in mental demands or environmental change would cause Plaintiff to decompensate, pointing to Plaintiff's inconsistent treatment history and refusal to take medication. (*Id.*) The ALJ expressed doubt as to Plaintiff's explanation that he refused to take medication because he did not want to be reminded that he had a problem, explaining that Plaintiff's complaints of severely limiting symptoms and application for benefits undercut that rationale. (*Id.*) As with the GAF score given by Dr. Buoen, the ALJ discounted Mr. Hitzelberger's GAF score because it accounted for social and economic factors irrelevant to the SSA standard for disability. (*Id.*)

Concluding that Plaintiff's treatment record, taken in concert with the opinion evidence submitted, was insufficient to support a finding of severe limitation, the ALJ ruled that Plaintiff's medically determinable impairments caused only moderate limitation in residual functioning, consistent with her assessment of Plaintiff's residual functional capacity. (Tr. 53.)

At step-five of the eligibility analysis, after determining that Plaintiff had no past relevant work, the ALJ found that there were jobs that exist in sufficient numbers in the national economy that Plaintiff could perform. (Tr. 53–54.) Relying on the vocational expert's testimony, which accounted for Plaintiff's age, education, work experience, and residual functional capacity, the ALJ ruled that Plaintiff could perform adequately in a variety of cleaning occupations. (Tr. 54.) Thus, because Plaintiff was able to work, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Act, at any time from July 22, 2011 to the date of the ruling, February 26, 2013. (*Id.*)

## DISCUSSION

### I.   Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded. Under the Social Security Act, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Court's review of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart,* 457 F.3d 882, 892 (8th Cir. 2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole." *Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted); *see also Haley v. Massanari,* 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckley v. Apfel,* 152 F.3d 1056, 1059 (8th Cir.1998)). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin,* 811 F.2d at 1199 (quotation omitted). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id.* In reviewing the administrative decision, " '[t]he substantiality of [the] evidence must take into account whatever in the record fairly detracts from its weight.' " *Id.* (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala,* 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala,* 25 F.3d 712, 714 (8th Cir. 1994) (citation omitted); *accord Woolf,* 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). The possibility that the

Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala,* 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. 20 C.F.R. § 404.1512(a); *Young v. Apfel,* 221 F.3d 1065, 1069 n. 5 (8th Cir. 2000); *Thomas v. Sullivan,* 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second, that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel,* 204 F.3d 853, 857 (8th Cir. 2000) (citations omitted).

## II.    Analysis of the ALJ's Decision

Plaintiff alleges that the ALJ erred in her treatment of the medical opinion evidence on the record. Specifically, Plaintiff argues that: (1) the ALJ should not have given Plaintiff's treating medical sources minimal weight; (2) the ALJ's decision to give Plaintiff's examining medical sources only limited weight was error and unsupported by the record, and; (3) the ALJ's reliance on non-examining State Agency Consultant opinions as the basis for Plaintiff's RFC assessment was improper and could not constitute substantial evidence.

In deciding whether a claimant is disabled, the ALJ considers medical opinions in the case record together with the rest of the relevant evidence

received. 20 C.F.R. § 404.1527(b). When determining the weight to be given to medical opinions, the ALJ considers if the source of the medical opinion had an examining or treatment relationship with the claimant, if the opinion is supported by relevant evidence, if the opinion is consistent with the record as a whole, if the medical source has specialized knowledge about the issues he or she is giving an opinion on, and other factors, such as if the medical source has a thorough understanding of SSA disability programs and evidentiary standards. 20 C.F.R. § 404.1527(c).

Opinions of treating physicians are given "controlling weight" if they are "well supported by . . . medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with other substantial evidence. *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citation omitted). Since the entire record must be evaluated as a whole, however, "a treating physician's record does not automatically control." *Id.* An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000). A claimant's noncompliance with treatment, or a medical source's overreliance on a claimant's subjective reporting, constitutes evidence for discounting a medical opinion. *Renstrom v. Astrue,* 680 F.3d 1057 1064–65 (8th Cir. 2012); *Owen v. Astrue,* 551 F.3d 792, 800 (8th Cir. 2008). The ALJ must give "good reasons" for the

weight it decides to give to a treating source opinion. 20 C.F.R § 404.1527(c)(2).

Plaintiff's claims of error are considered in turn.

### A. Whether the ALJ Erred in Giving "Little Weight" to the Treating Source Opinions of Dr. Buoen and Mr. Hitzelberger

#### i. Dr. Victoria Buoen's Opinion Evidence

Plaintiff's argues that the ALJ improperly discounted Dr. Buoen's opinion as a treating source, and that in doing so she failed to follow the SSA regulations. (Pl.'s Br. at 14–16.) In particular, Plaintiff alleges that the ALJ's conclusion that Dr. Buoen's opinion was "generalized and conclusory" and contained "no specific information regarding work-related ability and limitations" was not supported by SSA regulations and failed to account for the nature of Plaintiff's treatment history. *Id.* Plaintiff argues that the ALJ's ultimate finding that Dr. Buoen's opinion was inconsistent with her records, and the record as whole, is unsupported by substantial evidence in the record, and, in certain respects, the ALJ's conclusion was "patently absurd." (Pl.'s Br. at 15–16.) After assessing Plaintiff's claims, the Court finds them to be an insufficient basis for overturning the ALJ's decision, and holds that substantial evidence supports the ALJ's decision to give Dr. Buoen's opinion little weight.

Plaintiff insists that the SSA regulations show Dr. Buoen need not provide specific information regarding workability, and do not preclude her from making general statements. (Pl's Br. at 15 (citing 20 C.F.R. § 404.1527(a)(2))). Going further, Plaintiff asserts that generalization is necessary for efficiency, and that

Dr. Buoen's opinion was sufficient because it included her judgments, a summary of Plaintiff's symptoms and diagnoses, and her opinion that he suffered from a "profound inability to function in society." (*Id.*)

When considering the opinion of a treating physician, an ALJ should give it more weight because the doctor has a "longitudinal picture of [the] impairment", *Shontos v. Barnhart*, 328 F.3d 418, 428 (8th Cir. 2003) (citing 20 C.F.R. § 404.1527(d)), but if the opinion "consists of nothing more than vague, conclusory statements, the ALJ may properly disregard it. *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996). If a treating physician's opinion is supported "by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with . . . other substantial evidence," it receives controlling weight. 20 C.F.R. § 416.1527(c)(2). If it does not receive controlling weight, the ALJ determines the proper weight to give an opinion by considering, among other things, its supportability and consistency. *Id.* An ALJ must provide good reasons for the weight given to a treating source opinion. *Id.*

Contrary to Plaintiff's claims, Dr. Buoen's conclusory generalizations were not sufficient to support her opinion that Plaintiff suffered from severe limitations. The SSA regulations plainly require that treating medical source opinions be supported by "clinical and laboratory diagnostic techniques," and provide that the amount of weight given to any medical opinion is contingent on the amount of evidence provided to support it. *See* 20 C.F.R. § 404.1527(c)(2–3). Plaintiff asserts that Dr. Buoen need not have provided clinical evidence to support her

42

opinion because various clinical findings have been associated with Plaintiff's diagnoses of Schizophrenia and ADHD, and some, but "not all of them", could be present in this case. (*See* Pl.'s Reply Br. at 2–3.) The SSA regulations require more. Accordingly, the Court finds that the ALJ properly discounted Dr. Buoen's treating source opinion.

Plaintiff maintains that the ALJ's determination that Dr. Buoen's opinion was inconsistent with her own treatment records and the record as a whole is unsubstantiated, and contrary to the weight of the evidence. (Pl.'s Br. at 15–16.) He points, specifically, to his ongoing treatment for social avoidance and isolation, his examination by Ms. Syverson, and his October 2011 hospitalization as support for his position. (*Id.*) As explained above, when reviewing the record for substantial evidence the Court may not substitute its opinion for the ALJ's, *Woolf v. Shalala,* 3 F.3d 1210, 1213 (8th Cir.1993), and it may only overturn an ALJ's conclusions if a "reasonable mind could [not] accept the ALJ's determination." *Hill v. Colvin*, 753 F.3d 798, 800 (8th Cir. 2014).

In reviewing the record, the ALJ provided significant detail about Plaintiff's activities of daily living and course of treatment. (Tr. 42; 46–47.) She noted that Plaintiff wrote songs, played guitar, sang daily, took Tae Kwon Do lessons with others twice a week for eight months, occasionally drove, handled his own finances, read about philosophy, science, psychology, and religion, performed self-care independently and without need for help or encouragement, and left his home a few times a week. (Tr. 42.) In discussing Plaintiff's course of treatment,

43

she described how he inconsistently attended therapy, quit attending outpatient

treatment following his 2011 hospitalization after only a few sessions, showed

improvement when he did attend therapy, was able to use Eastern philosophy,

yoga, and relaxation techniques to alleviate symptoms, repeatedly discontinued

using prescribed medication without consulting his treatment provider, and

persistently failed to follow through with treatment and medication

recommendations. (Tr. 46–47.) Addressing Dr. Buoen's treatment records in

particular, the ALJ found that over the course of treatment Plaintiff reported

increasing his social contacts and enjoying it, that he was taking college classes,

and that when his symptoms worsened he would stabilize through the use of

anxiety medication and other modalities. (*Id.*) The ALJ noted that Plaintiff was not

taking antidepressant or antipsychotic medication, and declined to do so even

when his symptoms became significantly worse. (*Id.*)

While Plaintiff arrays evidence against the ALJ's conclusion, the Court

cannot overturn the ALJ's decision merely because evidence supports the

opposite conclusion. *Mitchell v. Shalala,* 25 F.3d 712, 714 (8th Cir.1994). The

ALJ's determination that Dr. Buoen's opinion was inconsistent with evidence

existing elsewhere in her records, and the record generally, is reasonably

supported by the ALJ's thorough analysis of the entire record. (Tr. 51–52.)

Therefore, the Court finds that her decision to give Dr. Buoen's opinion little

weight is supported by substantial evidence on the record as a whole.

### ii.  Mr. Hitzelberger's Opinion Evidence

Plaintiff next argues that the ALJ erred in giving Mr. Hitzelberger's opinion little weight. Plaintiff's position is based on two points. First, he asserts that the ALJ's conclusions regarding Mr. Hitzelberger's "tentativeness about assessing claimant's workability" were inappropriate in light of SSA regulations reserving issues of workability to the Commissioner of Social Security. (Pl.'s Br. at 16–17.) Second, Plaintiff contends that the ALJ's based her finding that Mr. Hitzelberger's opinion was inconsistent with the record on poor reasoning. (*Id.* at 17.) The Court rejects Plaintiff's first contention as without merit, and on his second argument notes that the Court must give deference to the ALJ's conclusions, and cannot disturb them simply because an alternative holding appears preferable. Accordingly, the Court finds that the ALJ's decision to give Mr. Hitzelberger's opinion little weight is supported by substantial evidence.

Plaintiff argues that the tentativeness exhibited by Mr. Hitzelberger in the opinion letter and MRFCQ comports with Agency regulations reserving questions of workability to the Commissioner of Social Security. (*Id.* at 16–17.) He asserts that Mr. Hitzelberger properly limited his discussion to the nature and severity of Plaintiff's impairments, and that the ALJ should not have discounted his opinion as a result. (*Id.*) As explained above, a treating source is given controlling weight if supported by medically acceptable clinical and laboratory diagnostic techniques and if it is not inconsistent with other substantial evidence. 20 C.F.R. § 404.1527(c)(2). If an opinion is generalized or conclusory, the ALJ may disregard

45

it. *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996). Further, if a treating source "renders inconsistent opinions that undermine the credibility of such opinions," the treating source's opinion may be discounted or disregarded. *Blackburn v. Colvin*, 761 F.3d 853, 860 (8th Cir. 2014) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)).

Plaintiff is correct that the ultimate determination of disability is the Commissioner's alone. *Choate v. Barnhart*, 457 F.3d 865, 870 (8th Cir. 2006). However, this does not excuse a treating physician from supporting his opinion, or from the need to provide consistent conclusions. The ALJ noted that in his opinion letter, Mr. Hitzelberger explained that he did not make statements about a patient's specific ability to sustain competitive employment, but that people with Plaintiff's disorders can have great difficulty sustaining employment. (Tr. 52–53; 373–76.) The ALJ also highlighted Mr. Hitzelberger's statement that Plaintiff's 2009 neuropsychological might need to be redone, and that he could not determine whether Plaintiff would need additional unscheduled breaks or absences due to symptoms or treatment. (Tr. 51–52; 376.)  Despite this uncertainty, Mr. Hitzelberger indicated on the MRFCQ that Plaintiff suffered from marked limitations in functioning in a number of work-specific contexts, including marked restriction in his ability to complete a normal work-day and work-week without interruption from his symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 375.) Further, the Court notes, and Plaintiff emphasizes, Mr. Hitzelberger assessed Plaintiff's

highest GAF score over the past year as 44. (Tr. 374.) But, Mr. Hitzelberger's own notes from his initial assessment of Plaintiff from April 27, 2011, completed less than four months before he submitted the MRFCQ, show that he gave Plaintiff a GAF score of 50. (Tr. 290.) The inconsistencies within Mr. Hitzelberger's opinion and treatment records, coupled with his reluctance to make any specific, non-general statements about Plaintiff's condition, provide substantial support for the ALJ's decision to discount Mr. Hitzelberger's conclusions.

Plaintiff disputes the ALJ's finding of inconsistency, arguing that the daily activities cited by the ALJ do not conflict with Mr. Hitzelberger's opinion, and instead lend it support. (Pl.'s Br. at 17.) Plaintiff does not address the ALJ's conclusion that Mr. Hitzelberger's finding that Plaintiff would decompensate as the result of marginal change in mental demands or environment was unsupported by the record in light of his inconsistent compliance with treatment, or that Plaintiff's explanation regarding this inconsistent compliance was not persuasive. (Tr. 52–53.) Responding to these arguments, Defendant correctly notes that the issue for the Court on review is not whether evidence supports Plaintiff's interpretation, but if substantial evidence supports the ALJ's ruling. (Def.'s Br. at 11.) Given the ALJ's thorough review of the record, as discussed above, and the inconsistencies within and lack of evidence provided in support of Mr. Hitzelberger's opinion, the Court finds that the ALJ's conclusions are reasonable. Thus, regardless of the merits of Plaintiff's alternate interpretation of

the record, the Court finds that the ALJ's decision to give Mr. Hitzelberger's

opinion little weight is supported by substantial evidence and must be upheld.

### B. Whether the ALJ Erred in Giving Minimal Weight to the Medical Source Opinions Provided by the 2009 and 2012 Neuropsychological Evaluations, and the 2011 MMPI-2 Testing

#### i. 2009 Neuropsychological Evaluation

Plaintiff claims that the ALJ's decision to give the 2009 evaluation limited

weight was error. His argument consists of two parts. First, he asserts that the

ALJ mischaracterized the 2009 evaluation as school-related, and wrongly

concluded that its findings and recommendations were limited to educational

accommodation. (Pl.'s Br. at 17–18.) Plaintiff then argues that the ALJ

misinterpreted the evaluation's findings by placing undue emphasis on Plaintiff's

intellectual functioning scores, and erred by focusing on the limited

accommodations Plaintiff actually received in school instead of the larger number

recommended as a result of the testing. (*Id.*) The Court disagrees with Plaintiff's

contentions, and holds that the ALJ's decision to discount the 2009 evaluation is

supported by substantial evidence.

Plaintiff alleges that the ALJ's decision to discount the 2009 evaluation

because it was primarily focused on limitations in a college-level academic

setting instead of ability to work is unfounded, and was in error. (Pl.'s Br. at 17–

18; Tr. 51.). At step four of the sequential evaluation process prescribed by SSA

regulations, the ALJ's considers medical evidence to determine if a claimant has

the residual functional capacity to perform work. *See Fines v. Apfel*, 149 F.3d

893, 894–95 (8th Cir. 1998); 20 C.F.R. §§ 404.1520(a), 416.920(a). When reviewing a medical source opinion, an ALJ considers its supportability, consistency, and specialization. *See* 20 C.F.R. § 404.1527(c). In her review of this report, the ALJ noted the report's conclusions were focused on Plaintiff's ability to function in an academic setting. (Tr. 51.) While the report suggested that Plaintiff seek treatment for his issues with anxiety, depression, and attention, its discussion of those issues was in reference to his "chronic academic underachievement." (Tr. 238.) As Defendant notes, the large majority of recommended accommodations concerned improving Plaintiff's school performance. (*See* Def.'s Br. at 13.)

In evaluating evidence, it is reasonable for the ALJ to consider a source's focus and assess how that focus bears on an opinion's supportability and consistency with the rest of the record. *See* 20 C.F.R. §§ 404.1527; 416.927. Here, the ALJ found that the 2009 report's emphasis on academic functioning limited its value in assessing Plaintiff's work-related functioning. (Tr. 51.) Plaintiff asserts that "[t]here is no support whatsoever for the ALJ's characterization of this report as being limited to a 'school-related assessment,'" but points to no evidence and provides no reasoning in support of his position. (Pl's Br. at 18.) The Court finds that the ALJ's characterization of the 2009 evaluation as school-related is reasonable in light of the record, and holds that her decision to discount its weight was not error.

Plaintiff also contends that the ALJ erred in her interpretation of the test scores contained within the 2009 evaluation, and that she improperly emphasized the accommodations Plaintiff actually received instead of those that were recommended by the test results. (*Id.*) Defendant responds, and the Court agrees, that the ALJ's role is not to "accept any medical evidence as true," but rather "weigh and evaluate evidence . . . [by] comparing it to other evidence in the record. (Def.'s Br. at 13 (citing 20 C.F.R. §§ 404.1527(c); 416.927(c)).) As part of this role, the ALJ must consider Plaintiff's actual accommodations and his performance with those accommodations to determine whether he is as limited as the 2009 evaluation suggests. After a full review, the ALJ concluded that some parts of the report were consistent with the record, particularly those evidencing his limited ability to sustain concentration, persistence and pace, and that other portions were not. (Tr. 51.) Because she appropriately weighed all of the evidence, the Court finds that the ALJ's decision to afford the 2009 evaluation limited weight is supported by substantial evidence on the whole record.

### ii.  2012 Neuropsychological Evaluation

Plaintiff argues that the ALJ's decision to discount the 2012 neuropsychological evaluation performed by Ms. Syverson was error, disputing the ALJ's determination that the evaluation was flawed because it relied on Plaintiff's reporting of his symptoms. (Pl.'s Br. at 19–20.) The Court agrees with Plaintiff. However, because the assessment's conclusions are more consistent

with the ALJ's RFC finding of moderate limitation than Plaintiff's allegations of marked restrictions, the Court holds that this error was harmless.

Plaintiff maintains that Ms. Syverson's opinion was founded not only on an interview with Plaintiff, but also the results from seven separate tests. (*Id.* at 18.) Plaintiff asserts that all seven tests produced results indicating severe mental impairment, that Ms. Syverson used specific test results to shape her conclusions regarding Plaintiff's mental health, and that the ALJ failed to either consider or acknowledge any testing. (*Id.* at 19–20.) An ALJ, when considering medical source opinions, can decide to give them less weight if they are based primarily on a claimant's subjective complaints and not a physician's own objective findings. *See Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012) (citing *Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir. 2011). In evaluating mental health, however, a physician's diagnoses and medical assessments are necessarily dependent on a patient's reporting of symptoms. *See Ferrando v. Commissioner of Social Security Administration*, 499 Fed. Appx. 610, 612 (9th Cir. 2011); *Reddick v. Chater*, 157 F.3d 715 (9th Cir. 1998).

The ALJ explained that she was discounting the 2012 evaluation because its results were based on Plaintiff's inconsistent reporting. (Tr. 51.) Specifically, she found that Plaintiff's claims of very limiting symptoms did not accurately reflect his course of treatment, his reporting made to other treatment providers, and the continued non-compliance with treatment. (*Id.*) The ALJ noted that Plaintiff denied any symptoms from May 2012 forward despite receiving no

medication. (*Id.*) The ALJ did not discuss the fact that Plaintiff's reporting involved both conversation and the administration of tests, and she did not find that Ms. Syverson's opinion overly relied on subjective reporting at the expense of her own objective findings. (*Id.*) While the ALJ properly weighed Ms. Syverson's opinion against the whole record, this failure to acknowledge the relevance of objective test results in the formation of that opinion impaired her analysis. Therefore, the Court finds that her decision to give Ms. Syverson's opinion very limited weight cannot be supported by substantial evidence, and is error.

Defendant, anticipating this weakness in the ALJ's ruling, argues that even if Ms. Syverson's opinion deserved more weight, the error is harmless. (Def.'s Br. at 16–17.) Defendant supports this claim by comparing Ms. Syverson's statement that Plaintiff was "likely to do best in jobs that do not require a large amount of social interaction" with the ALJ's RFC finding that Plaintiff was limited to "brief, superficial, and infrequent contract with co-workers and supervisors, [and] no contact with the public". (Tr. 44; 526.) Defendant argues that the ALJ's assessment, which found only moderate limitation, was more restrictive than Ms. Syverson's. (Def.'s Br. at 16–17.) As a result, Defendant argues that the ALJ's final conclusion would remain the same irrespective of the weight given to the 2012 assessment. (*Id.*) To show an error was not harmless, Plaintiff must provide some indication that the ALJ would have decided different in the absence of the error. *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012). An ALJ's failure to

properly weigh a medical opinion involves harmless error if there is no inconsistency between the opinion and the ALJ's assessment of residual functional capacity. *See Mays v. Colvin*, 739 F.3d 569, 578–79 (10th Cir. 2014).

The only support Plaintiff provides for the possibility of a different outcome is evidence that all seven tests performed by Ms. Syverson indicated significant mental impairment. (Pl's Br. at 19–20.) This is consistent with the ALJ's finding at step two that Plaintiff suffered from a number of severe mental impairments. (Tr. 39.) Moreover, as Defendant claims, Ms. Syverson's opinion is arguably less restrictive than the ALJ's RFC assessment. As Plaintiff has not given any other indication that the ALJ's opinion would have changed if she had not erred, the Court finds that the ALJ's improper discounting of the 2012 evaluation was harmless error.

### iii.  2011 MMPI-2 Testing

Plaintiff next asserts that the ALJ erred in giving less weight to the MMPI-2 results because of its reliance on Plaintiff's subjective reporting and the inconsistent response pattern noted in the interpretive report. Plaintiff's argument has two parts. First, Plaintiff contends that the ALJ's decision to discount the test results because they relied on subjective reporting was "nonsensical" and "purely speculative." (Pl.'s Br. at 20.) Second, Plaintiff argues that the ALJ's emphasis on the noted inconsistent response pattern constituted misrepresentation of the findings, and a non-expert, lay interpretation of raw psychological test data. (*Id.* at 20–21.) Because the ALJ completed a thorough review of the record and

based her determination not only on the weaknesses of the MMPI-2 process but also on the inconsistency between the results generated and the rest of the record, the Court finds that her decision to give the results less weight was supported by substantial evidence.

Plaintiff alleges that the ALJ wrongly discredited the MMPI-2 test results because they excessively relied on Plaintiff's subjective reporting, and because the ALJ improperly attempted to interpret raw testing data. (Pl.'s Br. at 20–21.) Plaintiff does not address the ALJ's broader determination that the conclusions based on the MMPI-2 test results are inconsistent with Plaintiff's general functioning, course of treatment, and activities of daily living. As the Court discussed previously, discounting the results of mental health testing solely because of reliance on subjective reporting is improper. *See Ferrando v. Commissioner of Social Security Administration*, 499 Fed. Appx. 610, 612 (9th Cir. 2011); *Reddick v. Chater*, 157 F.3d 715 (9th Cir. 1998). An ALJ also must not substitute her own lay opinion for the opinion of a physician. *See Reeder v. Apfel*, 214 F.3d 984, 987 (8th Cir. 2000).

Here, the ALJ did not dismiss the MMPI-2 test results out of hand, but instead discussed the relationship between those test results and the larger record. (Tr. 51.) The Court agrees with Plaintiff that the ALJ should not have emphasized reliance on Plaintiff's subjective reporting, but as this was only part of her larger conclusion about the consistency of the test results with the entire record, it was not error. The ALJ's reference to the inconsistent response pattern

54

noted by the tester likewise does not constitute lay interpretation of medical test results. (Tr. 51.) The tester noted that Plaintiff's profile was "probably valid", but indicated that "caution should be taken" in interpreting certain portions of his results. (Tr. 505.) When weighing a medical source opinion against the whole record, an ALJ is allowed to parse specific portions of a report without impermissibly "playing doctor". *See Pate-Fires v. Astrue*, 564 F.3d 935, 946–47 (8th Cir. 2009) (citing *Rohan v. Chater*, 98 F.3d 966 (7th Cir. 1996)).

Thus, the only question remaining is whether the ALJ's decision to give less weigh is supported by the whole record. Plaintiff has not addressed this question, and, after independent review of the record, the Court finds no reason to disturb the ALJ's ruling. Therefore, the Court finds that the ALJ's decision to give the 2011 MMPI-2 test results less weight because of their inconsistency with Plaintiff's general functioning, course of treatment, and activities of daily living is supported by substantial evidence on the whole record.

### C. Whether the ALJ Erred in Giving "Great Weight" to the State Agency Psychological Consultant Opinions

Turning to the ALJ's decision to give "great weight" to the State Agency consultant opinions of Dr. DeSanctis and Dr. Boyd, Plaintiff alleges the ALJ erred in relying on non-examining, non-treating physicians to formulate Plaintiff's RFC. (Tr. 22–23.) Specifically, Plaintiff argues that the consultant opinions cannot provide substantial evidence, and that the opinions were based on an incomplete record. (*Id.*) Plaintiff goes further, claiming that the ALJ violated Agency policy

and Eighth Circuit precedent by relying on her own lay interpretation of the substantial record created subsequent to the reviews completed by Drs. DeSanctis and Boyd. (Tr. 23.) After reviewing the ALJ's reasoning and the record, the Court concludes that the ALJ's determination that the consultant opinions were consistent with the whole record is adequately supported. Accordingly, the Court finds that the ALJ's decision to afford the consultant opinions great weight is supported by substantial evidence.

Plaintiff argues that clear Eighth Circuit precedent provides that the opinions of non-examining State Agency consults do not constitute substantial evidence, and that the ALJ's use of the opinions of Drs. DeSanctis and Boyd was error. (Pl.'s Br. at 22.) An ALJ's determination of residual functional capacity is based on all the evidence on the record, including "the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (citing *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). While Plaintiff is correct that the opinion of a consulting physician alone generally does not constitute substantial evidence, the ALJ can decide to give weight to a consultant opinion if it is supported by her own independent review of the record. *Id.* at 1024. Indeed, "[i]n appropriate circumstances, opinions from State Agency medical and psychological consultants . . . may be entitled to greater weight than the opinions of treating or examining sources." SSR 96-6p, 1996 WL 374180, at

*3. The ALJ considers non-examining State Agency consultant opinions in accordance with 20 C.F.R. § 404.1527.

The ALJ gave great weight to the opinions of the State Agency psychological consultants because they reviewed the record, have specialized knowledge in assessing impairment within the SSA standard, and because their opinions were consistent with the whole record. (Tr. 50–51.) As discussed previously, the ALJ completed an extensive review of the record, addressing and explaining her conclusions regarding Plaintiff's course of treatment, activities of daily living, and his restrictions in functioning. (Tr. 44–50.) Her adoption of the consultants' opinions regarding Plaintiff's residual functional capacity is supported by this examination. Moreover, the ALJ provided good reasons, supported by substantial evidence, for her decision to give Plaintiff's treating and examining physician opinions limited weight, thereby showing that it was appropriate to give the consultant opinions greater weight. (Tr. 50–53.) As the ALJ's decision to give great weight to the State Agency consultant opinions is supported by her independent review of the record, and because her decision to discount other opinion evidence is sufficiently explained and supported by the record as a whole, the Court finds the ALJ did not err in her weighing of Dr. DeSanctis's and Dr. Boyd's opinions.

Plaintiff also contends that the State Agency consultant opinions did not account for the whole record, and are therefore invalid. (Pl's Br. at 22–23.) In her opinion, the ALJ addressed this concern by explaining that evidence received

subsequent to State Agency review did not reflect significant worsening, especially in light of the connection between Plaintiff's inconsistent treatment compliance and the worsening of his symptoms. (Tr. 50–51.) Plaintiff correctly notes that Agency opinions that do not account for the full record cannot constitute substantial evidence. *See Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995). As described above, however, the ALJ's decision does not rely on the consultant opinions alone for substantial weight. Instead, the ALJ completed her own independent, thorough review of the record, accounting for all the medical evidence generated subsequent to State Agency review, and concluded that it would not alter the consultant's conclusions. (Tr. 48–50.)  This conclusion is supported by the substantial evidence in the record as a whole, described above.

Plaintiff claims that by interpreting the record without the fully informed opinions of the State Agency consultants, the ALJ relied on her lay interpretation of the evidence. (*Id.* at 23.) The Court does not agree. The ALJ did not substitute her own interpretation of medical records for that of a physician; she weighed evidence against the whole record as required by SSA regulations and found that the consultant opinions were most consistent with the body of evidence. *See Pate-Fires v. Astrue*, 564 F.3d 935, 946–47 (8th Cir. 2009); 20 C.F.R. § 404.1527. The Court finds that the ALJ properly weighed the opinions of State Agency consultant Drs. DeSanctis and Boyd, and holds that her decision to afford their conclusions great weight is supported by substantial evidence on the record as a whole.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment (Doc. No. 14) is **DENIED**;

2. Defendant's Motion for Summary Judgment (Doc. No. 16) is **GRANTED**; and

3. This case is **DISMISSED WITH PREJUDICE**.


**LET JUDGMENT BE ENTERED ACCORDINGLY**


Date: May 6, 2015

_s/*Jeffrey J. Keyes*_____
JEFFREY J. KEYES
United States Magistrate Judge